Filed 4/18/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JAMAAL REX HARRISON,<br><br>　　　　Defendant and Appellant. | A132915<br><br>(Alameda County<br>Super. Ct. No. C164477) |

　　　　A jury convicted defendant Jamaal Rex Harrison of sex offenses in connection with attacks on four women over a period of two years, and he was sentenced to 100 years to life in prison. On appeal, Harrison argues that his convictions must be reversed because the trial court declined to substitute his second appointed counsel, advised him improperly during the brief time when he was allowed to represent himself, failed to adequately continue the trial date, and prohibited him from questioning the victims about whether they had engaged in prostitution. He also argues that his defense counsel was ineffective and that the prosecutor engaged in misconduct. We reject each of these claims and affirm.

　　　　In the published portion of this opinion, we conclude that the trial court had no duty to inform Harrison of his option to request advisory counsel after it granted his request to represent himself.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.2.-3., 7., 8.a., c. & d., B.-D.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

*A. Jane Doe No. 1*[1]

About 10 p.m. on April 4, 2006, 14-year-old Jane Doe No. 1 was waiting for a bus at 104th Avenue and International Boulevard in Oakland as she was returning home from her boyfriend's house. Harrison attacked her by pulling her by her hair into his van and forcing her to copulate him orally as he drove away. He then drove to a secluded area and forced her to copulate him orally again, this time outside the vehicle. Harrison then raped Jane Doe No. 1, penetrating her about three times, and he tried to sodomize her. Harrison's DNA was found on a vaginal swab taken from the victim.

As a result of the attacks on Jane Doe No. 1, the jury convicted Harrison of one count of forcible rape (§ 261, subd. (a)(2)—count 1), two counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 2, 3), and one count of attempted forcible sodomy (§§ 286, subd. (c)(2), 664—count 4). As to each count, the jury also found true allegations under section 667.61 (commonly known as the one-strike law) that Harrison kidnapped Jane Doe No. 1, which substantially increased her risk of harm (§ 661.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed a sex offense against multiple victims (former § 667.61, subd. (e)(5), now subd. (e)(4)).

*B. Jane Doe No. 2*

Around 8 p.m. on November 1, 2006, 18-year-old Jane Doe No. 2 was walking on Foothill Boulevard in the eastern part of Oakland to visit a girlfriend, when Harrison attacked her from behind and dragged her into his van. He drove for 10 to 15 minutes, and then forced her to copulate him orally. He also digitally penetrated her, put his mouth on her chest, raped her twice, and hit her in the face and chest. Jane Doe No. 2 eventually was able to fight her way out of the vehicle. Employees of a nearby organic

---

[1] The victims were identified at trial as Jane Does. (Pen. Code, § 293.5.) All statutory references are to the Penal Code unless otherwise indicated.

tea plant heard her screams and opened a garage door to let her in. Harrison's DNA was found on a vaginal swab taken from the victim.

The jury convicted Harrison of two counts of forcible rape (§ 261, subd. (a)(2)—counts 5, 6), one count of forcible oral copulation (§ 288a, subd. (c)(2)—count 7), and one count of sexual penetration (§ 289, subd. (a)(1)—count 8). As to each count, the jury also found true one-strike allegations that Harrison kidnapped Jane Doe No. 2, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed a sex offense against multiple victims (former § 667.61, subd. (e)(5)).

### C. Jane Doe No. 3

In the early morning hours of September 29, 2007, 18-year-old Jane Doe No. 3 was near 12th and Market Streets in Oakland after attending a club where her cousin worked as a disc jockey. As she walked alone to her brother's house, Harrison grabbed her and pushed her up the steps of a church and through a walkway. He then yanked her hair, forced her to copulate him orally three times, and raped her twice. Afterward, Harrison tied her up using her bra and shoelaces, and he ran away. Harrison's DNA was found on a vaginal swab taken from the victim.

The jury convicted Harrison of three counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 9 through 11) and two counts of forcible rape (§ 261, subd. (a)(2)—counts 12, 13). As to each count, the jury also found true one-strike allegations that Harrison kidnapped Jane Doe No. 3, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); committed a sex offense against multiple victims (former § 667.61, subd. (e)(5)); and tied or bound the victim in the commission of the crimes (former § 667.61, subd. (e)(6), now subd. (e)(5)).

### D. Jane Doe No. 4

In the early morning hours of April 6, 2008, 20-year-old Jane Doe No. 4 was near 14th Street and Broadway in Oakland after getting off a bus and walking alone toward her mother's house. Harrison forced her into his van and made her orally copulate him as

3

he drove. He then parked his car in a dark, deserted area of San Pablo, where he digitally penetrated her, sodomized her, and forced her to copulate him orally two more times. He then drove away, and Jane Doe No. 4 called 911. Harrison's DNA was found on the victim's underwear and on a rectal swab taken from her.

The jury convicted Harrison of three counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 14, 15, 17) and one count of forcible sodomy (§ 286, subd. (c)(2)— count 16). As to each count, the jury also found true one-strike allegations that Harrison kidnapped Jane Doe No. 4, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed a sex offense against multiple victims (former § 667.61, subd. (e)(5)).

*E. Sentence*

The trial court sentenced Harrison to four consecutive terms of 25 years to life (one term for each victim), for a total indeterminate term of 100 years to life, with concurrent terms of 25 years to life on all remaining counts. This timely appeal followed.

II.
DISCUSSION

*A. Pretrial Representation*

1. Appointment of trial counsel

Harrison was represented at the preliminary hearing by an attorney who withdrew after the information was filed because Harrison could not afford to continue paying him. The trial court then appointed a new attorney for Harrison, but that attorney filed a motion to withdraw in less than two months, citing an irremediable breakdown in the relationship that made effective representation "impossible." The court granted the motion and, on the day before Thanksgiving 2010, selected a second court-appointed attorney, Deborah Levy, an experienced criminal defense lawyer, who represented Harrison through trial and sentencing.

4

## 2. January 24, 2011 *Marsden* hearing

Two months after Levy was appointed, Harrison sought to replace her. On January 24, 2011, the court held a hearing in accordance with *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), where Harrison complained that Levy had met with him about three weeks after she was appointed, but she was not prepared. He accused Levy of "hiding evidence" from him, and he further complained that the investigator assigned to his case had not yet looked at what Harrison believed was "key evidence." Levy acknowledged that she had taken time off during the holidays, and that the investigation was delayed because the investigator had been ill for more than two weeks. Still, Levy stated that she had read all three volumes of the preliminary hearing transcript and was familiar with the case. The trial court assured Harrison that Levy was "a competent and skilled trial lawyer."

Although he had previously waived his right to a speedy trial, Harrison indicated that he wanted to withdraw the waiver to expedite the trial. He stated that he was frustrated that he had been in custody for two years and that continuing to waive time was "a bad idea for [his] case." He explained that he "didn't want to waste a lot of time" and "wanted to push [his] case," but he was "still missing a lot of [his] reports" as well as a transcript of the preliminary hearing. Levy told the court that she wished to withdraw as counsel because Harrison was insisting on a speedy trial, and she could not be prepared for a trial in 60 days where there was "major discovery" and "the exposure [was] gigantic." She was concerned because extensive discovery needed to be addressed, the case involved multiple victims, and Harrison faced several life counts. When Harrison confirmed that he wanted to withdraw his speedy-trial waiver, the trial court warned him that any lawyer would have difficulty preparing for trial in such a complicated case within 60 days of appointment, and it would be "virtually impossible" to ensure effective representation in that time. The trial court denied the *Marsden* motion. The court did not address Levy's request to withdraw as counsel. Harrison withdrew his speedy-trial waiver at a disposition and setting hearing on January 31, and the trial court then set a trial date of March 21.

### 3. February 10, 2011 *Marsden* hearing

Fewer than three weeks after the first *Marsden* motion was denied, Harrison again sought to replace Levy. At a second *Marsden* hearing held on February 10, 2011, Harrison again complained that Levy had not provided him with various reports, transcripts, and recorded interviews, and that she had met with him only briefly. He also complained that he and Levy did not get along and that "[a]ll we do is argue on the phone and argue in the courtroom."

Levy told the trial court that she had repeatedly explained to Harrison that her most important task was to review discovery carefully and that she had told him that they would have a long meeting after she had completed her review. Levy acknowledged that she was busy working on other matters, including a capital case, but made clear that she would meet with him when she could. She expressed concern that the trial was then scheduled for March 21 and that Harrison had refused to further waive time. Harrison said he was aware that he could again waive his speedy trial right, but that "waiving time [wa]s not the problem," because he and Levy would "continue to argue and bump[] heads" even if he received more time. Levy promised that she "would do absolutely everything" she could to be prepared for trial on the scheduled date and that Harrison's case would be "absolutely [on] the top of my list of things to do" after completing a motion in her capital case.

The trial court denied the *Marsden* motion, stating that "under the particular circumstances of this case taking into consideration that a *Marsden* motion has been made and denied fairly recently, and that Mr. Harrison has had multiple attorneys in the past and in comparison Ms. Levy has not had as much time to get with the case as the other attorneys have, I feel that she is acting as a reasonably competent attorney under the circumstances."

The trial court maintained the scheduled trial date of March 21, and scheduled an interim disposition and setting hearing for February 23. At the unreported February 23 hearing, the trial court again maintained a trial date of March 21.

4.  March 22, 2011 *Faretta* hearing

On March 21, the matter was continued to the following day, when Harrison filed a petition to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). At the March 22 hearing on the petition, the trial court told Harrison that his attorney was a skilled lawyer and that the court had concerns about Harrison representing himself in such a serious case.  Harrison again complained that Levy had not visited him in jail to discuss strategy and had not given him information that he had requested.

The trial court noted that if Harrison continued to insist on his right to a speedy trial, the deadline to try him was April 1, 2011.  When the court asked Harrison whether he would be ready in time, Harrison responded, "I'm more than most likely going to have [to] end up waiving time because I don't have all the information that I need and I been seeking to try to get, and then I'll take it from them [*sic*].  I already know I pretty much aren't [*sic*] going to be ready in a week."

The prosecutor objected to Harrison once again waiving his right to a speedy trial. At one point, the hearing judge called the judge who was then assigned to try the case to ask what might happen regarding the timing of the trial if Harrison waived his right to a speedy trial.  The hearing judge then stated, "I think [the judge set to try the case] is going to make you go to trial within your 60 day period.  So you are welcome to waive time and see how successful you are at that point.  But you are not the only one involved in this trial, and that's sort of the bottom line.  Because you've gone no time waiver, which is absolutely your right, you have forced the prosecutor to get ready.  Now the prosecutor has got kind of a dog in this fight."  The hearing judge also told Harrison:  "I just asked [the judge assigned to try the case] about what her general policy is, and you'll be able to make whatever specific requests you have and whatever your reasons are, but I need you to understand really clearly at this point if I grant your motion to represent yourself it's with the understanding that you can go to trial within this 60 day period.  Are you ready to do that?"  Harrison confirmed that he was.

After advising Harrison at length about the pitfalls of self-representation and that he would be better off having Levy represent him, the trial court granted the *Faretta*

7

motion. The court did not specifically address scheduling issues, but it is clear from the hearing transcript and the minute order that the parties were to return the following day for a disposition and setting hearing. Although Levy had been relieved as counsel, the court nonetheless ordered her to appear the next day, in the event that the trial judge wanted to "take up the issue of standby counsel." The court then explained to Harrison the role of standby counsel: "If you get into too much water where you are starting to drown, Ms. Levy would be prepared to step right back and she's already sort of tuned up on the case."

### 5. March 23, 2011 hearing

The following day, the trial judge stated that she was not sure whether Harrison intended to seek a continuance of the trial, but that it was her understanding that the case would go forward as previously scheduled. When Harrison protested that he needed more time to prepare, the court stated, "Well, you can go ahead and waive time. Perhaps that gives you an extra few days to look at things. I think there's case law indicating that there was—that it was improper for a Court to grant less than five days for a continuance when there's been a situation like that so you may get an extra week, but the trial is going forward." Harrison asked, "So if I go pro per, I can't get time to study my case?" The court responded, "You cannot choose to go pro per to delay a trial; that's improper."

Harrison thereafter waived his right to a speedy trial. The trial court then told him: "What I am considering doing is appointing Ms. Levy as standby counsel. What I don't want to happen is this [to] go to a trial department and at the beginning, a third of the way or half the way and you decide that you can't represent yourself any longer, we talked about how serious this case is, and what you're facing in this case a bit, we touched on it a bit. I assume [the judge who handled the *Faretta* hearing] went through all of that with you yesterday. I see Ms. Levy is nodding her head in agreement, so I don't need to reiterate everything he said to you yesterday. But because of the nature of the charges here and the consequences of what you're facing, I am inclined to go ahead and appoint Ms. Levy as standby counsel. [¶] What that would mean is she's simply in the courtroom listening to the procedures, sir. She's not taking part in any way of doing anything up

8

here like you'll be doing as an attorney for yourself. But she will be present in the courtroom observing everything so that, like I said, there wouldn't be any continuance granted during the trial, because you suddenly decide you can't represent yourself any longer. But you won't be consulting with her during trial. She won't be telling you what to do. You will solely be representing yourself as you wish to do." Levy accepted the appointment.

Harrison again asked if he could have additional time to "look over [his] stuff." The court responded, "I'm sure you were advised by [the judge hearing the *Faretta* motion] that you will be given the same time, the same rights as anyone else at Santa Rita [Jail] that's representing himself or herself. I am not going to give you any additional time . . . ." The trial court denied Harrison's request for a continuance, and the matter was set for a jury trial five days later, on March 28.

6. March 28, 2011 request for counsel

The matter was called on the trial calendar on March 28, and the prosecutor immediately raised scheduling issues, explaining that "two critical witnesses" who had been available when trial had been set for the previous week now had planned vacations. The prosecutor expressed concern that Harrison was entitled to "some kind of continuance in order for him to prepare if he's continuing pro per," but that a one-week continuance "would put me right in the middle of my witness scheduling problems." The following exchange then took place:

"THE COURT: Okay. Let me just ask you, Mr. Harrison, you still want to continue representing yourself in this matter?

"THE DEFENDANT: I didn't know it was going to be like this.

"THE COURT: I can't hear you.

"THE DEFENDANT: I said I didn't know it was going to be like this. I can't do this on my own.

"THE COURT: Yeah, as I'm sure you will remember, I expressed serious misgivings about you representing yourself in a matter of this nature where it's my

9

understanding I believe there's DNA evidence and obviously you're facing a lot of time in custody. [¶] Is this a life?

"[The prosecutor]: Yes, many times over.

"THE COURT: Yeah, life in custody on this. Do you want me to go ahead and reappoint Ms. Levy as your counsel in this matter?

"THE DEFENDANT: I mean—

"THE COURT: Your *Marsden* motion was denied . . . as I understand it.

"THE DEFENDANT: Yeah—I mean, yeah.

"THE COURT: Do you want your attorney back in the case?

"THE DEFENDANT: Yeah, I can't do this on my own.

"THE COURT: Okay. I just want to make sure you're voluntarily now on your own, you're not being forced or coerced, but you voluntarily wish to have Ms. Levy represent you again?

"THE DEFENDANT: Yes."

The trial court then reappointed attorney Levy as defendant's counsel. Following a recess called so that the parties could discuss scheduling issues, both parties agreed to put the matter over until April 25 for trial.

7. April 25, 2011 *Marsden* hearing

When the matter was called on Monday, April 25, for a jury trial, the trial court first addressed "the schedule that we're going to have here if we're able to proceed at this time." The court stated that the trial was estimated to last four weeks, that all motions should be filed by the following morning to be heard on Tuesday and Wednesday, and that the matter would not be called again because of planned vacations until May 9, when jury selection would begin.

Before the brief hearing adjourned, Harrison sought for a third time to relieve his attorney. At the *Marsden* hearing, Harrison complained that he still had not received copies of information such as DNA results and recordings of victim statements, and he had not received the results of the search of his van following his arrest. Harrison also reported that he had asked Levy, "[A]re you sympathetic toward these alleged victims

10

and she told me yes." He stated that he and Levy "clash[ed]" and "bump[ed] heads," and that "[s]he just told me fuck you upstairs because I told her she [is] not Johnnie Cochran," a claim that the trial court did not believe.

Levy acknowledged that she had told Harrison that she had sympathy for the victims if they had been raped, but she explained that it was unnecessary "to hate them [the victims] in order to represent him." She also confirmed that she had cursed at Harrison when he became upset that she had sympathy for the victims, and she explained, "I've been doing this job for 30 years, and I know on both sides they are human beings."

As for her efforts to prepare for trial, Levy stated that she had met with Harrison for nearly four hours on April 5. She explained the lengths to which she had gone in order to secure relevant audio recordings for Harrison, and she summarized the discovery she had provided to him. She also reported that although Harrison's van had been seized, no forensic testing had been done on the vehicle, so there was no information to provide. She confirmed that she had read all discovery, had prepared for trial, and was ready. She also reported that she had advised Harrison that this was "not a good defense case" based on the allegations and the fact that DNA evidence linked Harrison to each of the victims.

The trial court denied Harrison's *Marsden* motion, stating, "We're going to start motions tomorrow. It may not be exactly what you [Harrison] think is appropriate, but having heard [Levy's] explanation of what she's done, knowing the kind of attorney that she is, the *Marsden* motion is denied."

Jury selection began on May 9, 2011, as scheduled, and opening statements took place on May 16.

### 8. No Pretrial Rulings Warrant Reversal

Harrison contends that his convictions should be reversed because of alleged errors made during pretrial proceedings. We reject each of his arguments.

11

### a. A Trial Continuance Was Not Improperly Denied

Harrison first claims that his right to a reasonable time to prepare for trial was violated because the trial court "refus[ed] to grant a continuance" on March 23, 2011, the day after his motion to represent himself was granted. (E.g., *People v. Clark* (1992) 3 Cal.4th 41, 110; see also *People v. D'Arcy* (2010) 48 Cal.4th 257, 287 [denial of motion for continuance reviewed for abuse of discretion].) Harrison's argument focuses entirely on the court's statements at the March 23 hearing that the trial would proceed as scheduled. But Harrison ignores that as late as February 10 he had been insisting on a speedy trial, notwithstanding the concerns mentioned to him by Levy and the trial court, and he did not waive his right to a speedy trial until March 23, two days *after* the scheduled trial date. He also ignores that the matter was then put over until March 28, at which time he did not specifically renew his request for additional time, agreed to the reappointment of Levy, and obtained a nearly month-long continuance of the trial. And this continued trial date was again postponed for almost two more weeks because of scheduling issues. Jury selection did not actually begin until May 9, 2011.

We find no reversible error in the trial court's denial of Harrison's request for more time on March 23, given his prior insistence that the trial proceed quickly, the continuances and extensions of the trial date that transpired after he eventually waived his right to a speedy trial, and his acceptance of his counsel's reappointment.

### b. Trial Court Had No Duty to Tell Harrison About Advisory Counsel Option

Harrison also claims that his convictions should be reversed because the trial court, after granting his motion to represent himself, did not advise him that he had the right to ask for " 'advisory counsel' or request an attorney to act as both advisory and standby counsel." We conclude that the trial court had no duty to give such advice. When Harrison was allowed to represent himself, the trial court appointed Levy as standby counsel. As was explained to Harrison, under a standby counsel arrangement, "the attorney takes no active role in the defense, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to

self-representation." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119, fn. 7.) By contrast, where "advisory counsel" is appointed, "the attorney actively assists the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests, but does not participate on behalf of the defense in court proceedings." (*Ibid.*) Our Supreme Court has made clear that "a defendant has *no right*, under either the federal or state Constitution, to [such forms of] 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them and the right under the federal Constitution to represent themselves, *but these rights are mutually exclusive.*" (*Id.* at pp. 1119-1120, italics added, fn. omitted.) Although the trial court may "permit the sharing of responsibilities between a defendant and a defense attorney when the interests of justice support such an arrangement," it is within the court's discretion to do so. (*Id.* at p. 1120.)

Where a defendant in a noncapital case has not requested advisory counsel, the trial court is under no obligation to appoint one sua sponte. (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1429; see also *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [court may appoint advisory counsel " '*if* and when the accused requests help' "], italics added.) "[A] defendant who has competently elected to represent himself should not be heard to complain that he was denied the assistance of advisory . . . counsel." (*Garcia* at p. 1431; see also *Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1394 ["It seems to us that a defendant either has an attorney or he is his own attorney— period"].) The rule that a defendant who exercises his right to self-representation cannot later complain that the quality of his defense amounted to ineffective assistance of counsel "is entirely eviscerated when a defendant is allowed to challenge a verdict on the ground that he or she was not provided with advisory or stand-by counsel." (*Garcia* at p. 1430.) Accordingly, we will not set aside the verdict in this case merely because the trial court declined to advise Harrison on its own initiative that he could ask for something to which he was not entitled.

The notion that a trial court has a duty to inform a defendant of the right to standby counsel has been rejected by the Ninth Circuit: "To require that a court

13

conducting a *Faretta* colloquy inform a criminal defendant that he or she may or may not receive a standby counsel would do nothing to focus the inquiry for the defendant[']s knowing and intelligent decision [to represent himself or herself].  Because there is no right to have a standby counsel appointed during self-representation, it follows that there is no right to have the court advise about the possibilities of standby counsel during the *Faretta* colloquy."  (*United States v. Mendez-Sanchez* (9th Cir. 2009) 563 F.3d 935, 947.) We find this reasoning persuasive and equally applicable in the context of advisory counsel.  (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [although California courts not bound by decisions of lower federal courts, "they are persuasive and entitled to great weight"].)

In this case, there is even less reason to conclude that the trial court needed to advise Harrison about advisory counsel because the court acted on its own to protect his interests by appointing standby counsel.  (*People v. Moore*, *supra*, 51 Cal.4th at p. 1120.) Moreover, there is no reason to believe that appointing advisory counsel would have better protected Harrison given his disagreement with his counsel's strategy decisions. We reject this claim of error.

### c.  *Harrison Effectively Waived His* Faretta *Rights*

Harrison also claims that his convictions should be reversed because he did not knowingly, voluntarily, and intelligently waive his right to self-representation when he told the trial court on March 28, 2011, that he no longer wished to represent himself.  We disagree.

"*Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request. [Citation.]"  (*People v. Dunkle* (2005) 36 Cal.4th 861, 908, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  "A defendant seeking self-representation ' "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " ' [Citation.]  As long as the record as a whole shows that the defendant understood the dangers of self-representation, *no particular form of warning is required*."  (*People v. Pinholster* (1992) 1 Cal.4th 865, 928-929, italics added,

14

disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) After the *Faretta* right has been asserted and granted, it may thereafter be waived or abandoned. (*Dunkle*, *supra*, at p. 909.)

Here, Harrison plainly waived his *Faretta* right. He told the trial court that he "didn't know it was going to be like this" and could not "do this on my own." In response, and before reappointing Levy, the trial court twice asked Harrison whether he wanted representation, stating, "I just want to make sure you're voluntarily now on your own, you're not being forced or coerced, but you voluntarily wish to have Ms. Levy represent you again?" Harrison replied, "Yes." Although "no particular form of warning" is required before a defendant is *granted* the right to self-representation (*People v. Pinholster*, *supra*, 1 Cal.4th at pp. 928-929), Harrison argues that the trial court's inquiry regarding his *waiver* of the right was constitutionally inadequate. We agree with respondent that the decision to proceed *with* counsel is not analogous to proceeding *without* counsel, which poses particular " ' "dangers and disadvantages" ' " to a defendant. (*Id.* at p. 928.) Although "courts must draw every inference against supposing that the defendant wishes to waive the right to counsel" (*People v. Marshall* (1997) 15 Cal.4th 1, 23), it does not necessarily follow that the courts must do the same when the defendant subsequently changes his mind to accept the appointment of counsel. (*People v. Kenner* (1990) 223 Cal.App.3d 56, 61 [reasonable to conclude that the right to self-representation is more easily waived *after* the right is asserted because right to self-representation waived more easily than right to counsel *before* right is asserted].) This is especially true when, as here, the defendant's statements asking for the reappointment of counsel were unambiguous.

Furthermore, not only did Harrison waive his right to self-representation, he also abandoned it after Levy was reappointed. (See *People v. Stanley* (2006) 39 Cal.4th 913, 929.) At no point during the April 25, 2011 *Marsden* hearing did Harrison ask to represent himself again. (*Stanley* at p. 933 [following denial of *Faretta* request, defendant never renewed it, supporting inference of abandonment of right to self-representation].) And at the conclusion of a pretrial hearing two days later, when asked

15

by the trial court, "You and Ms. Levy working things out fine?" Harrison responded, "Yes," prompting the trial court to observe that "[e]verybody seems to be happy right now," indicating that Harrison was currently satisfied with his representation.

Considering these exchanges, "the record contains no suggestion that defendant did not understand what he was giving up in confirming that he wished to be represented by counsel, or that he might in fact have wished to represent himself notwithstanding his statements to the contrary." (*People v. Dunkle*, *supra*, 36 Cal.4th at p. 910.) The record fails to support Harrison's argument that he did not knowingly, voluntarily, and intelligently waive his right to self-representation.

### d. The Marsden *Motions Were Properly Denied*

Harrison next claims that the trial court erred when it denied each of his three *Marsden* motions. " 'A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. [Citations.]' [Citation.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 917.) A judge considering a *Marsden* motion must give the complaining party " ' "an opportunity to present argument or evidence in support of his contention." ' " (*Ibid*.) When a defendant seeks new counsel on the basis that appointed counsel is providing inadequate representation, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Smith* (2003) 30 Cal.4th 581, 604 (*Smith*).) Harrison has demonstrated no such abuse of discretion here.

16

i.    January 24, 2011 *Marsden* motion

At the January 24 hearing, the trial court permitted Harrison to explain at length the basis for his claim that Levy was providing inadequate representation. (*Smith*, *supra*, 30 Cal.4th at p. 604.) Harrison now simply repeats the complaints he lodged below—that Levy had supposedly done insufficient work on his case at the time of the hearing. Levy stated at the hearing that she had read all three volumes of the preliminary hearing transcript. She also explained her efforts on the case and stated that she was going through the "quite massive" discovery that had been provided to her. The fact that she may not have been prepared for trial *at the time of the hearing* falls far short of "*per se* ineffective assistance of counsel*,*" as Harrison claims.

In making his argument, Harrison relies on *People v. Pope* (1979) 23 Cal.3d 412. But that case is inapposite. *Pope* considered the standard for determining whether defense counsel's performance at trial deprived the defendant a meritorious defense (*id.* at pp. 421, 425), while here the issue at the *Marsden* hearing was whether Levy was providing adequate representation at the time of the hearing, when time remained to fully prepare for trial. (*Smith*, *supra*, 30 Cal.4th at p. 604.) We see no abuse of discretion in the trial court's conclusion that Levy was adequately and professionally representing Harrison and that there was no breakdown in the attorney-client relationship requiring the court to grant the *Marsden* motion.

At the February 10 hearing, Harrison was again permitted to explain the reasons he believed that Levy was providing inadequate representation.  (*Smith*, *supra*, 30 Cal.4th at p. 604.)  Levy stated that she "would do absolutely everything I can . . . to be prepared to go to trial" on the scheduled date, and she explained that Harrison's case would "absolutely go to the top of my list of things to do" as soon as she filed a motion in another case.  Without citing to the record, Harrison claims on appeal that Levy had an "interest in favoring her other clients over [him]," "never attempted to correct her attitude, behavior, actions and omissions after the first *Marsden* hearing," and viewed the denial of the first *Marsden* motion "as a green light to continue to violate the . . . basic duties of competent counsel."  We disagree with his characterization of Levy's performance.

Harrison compares this case to *People v. Walker* (1976) 18 Cal.3d 232, 237-238, where defense counsel reported at a *Marsden* hearing that he had consulted with defendant at least nine times in court, and a defense investigator had interviewed more than ten prospective witnesses.  He claims that in this case Levy did "not even come close" to counsel's performance in *Walker*.  But *Walker* did not purport to set a minimum standard regarding the number of attorney-client visits.  It is also unclear when the defendant sought to replace his appointed attorney in *Walker*, and it does not follow that Levy was providing inadequate representation just because trial preparation remained to be done at the time of the February 10 hearing.

iii.     April 25, 2011 *Marsden* motion

Harrison next argues that at the time of his April 25 *Marsden* motion, Levy "had not completed an independent factual investigation and was relying on prosecutor discovery and statements of the prosecutor."  In fact, Levy explained at length the efforts she had undertaken at that point to prepare for trial and to provide Harrison with materials he had requested.  She also explained that the prosecution had a strong case because DNA evidence linked Harrison to the crimes and the attacks were similar, and there was not much she could do beyond trying to show that the victims were not credible

18

and that their sexual activities with Harrison were consensual. Levy confirmed her readiness by telling the trial court, "I believe I am ready. I have everything in binders. I have basically read all of the discovery."

On appeal, Harrison does not explain how an "independent factual investigation" would have turned up additional helpful information or how the prosecutor's discovery or statements were inaccurate or subject to challenge. Harrison claims, without citation to the record, that he had a single meeting with Levy that "was inadequate and demonstrated to defendant that she barely knew anything about the case." But Levy stated she had met with Harrison *three* times, and explained that she had listed relevant evidence in columns and noted that the incidents were "very, very similar." On appeal, Harrison challenges the similarity of the attacks, even though they followed similar patterns and all the victims were young women who were attacked late at night or in the early morning hours while walking alone in Oakland in or near an area that Harrison himself testified was frequented by prostitutes.

Finally, we reject Harrison's contention that the trial court "lost all objectivity when it twice accused [Harrison] of lying and based [its] opinion [about his veracity] on the grounds that he was accused of crime and wearing jail clothes." It is true that the trial judge told Harrison twice that she did not believe claims about statements he attributed to Levy but which she denied making. The court nonetheless permitted Harrison to explain at length why he thought his counsel was providing inadequate representation before ruling on his motion. (*Smith*, *supra*, 30 Cal.4th at p. 604.) After the trial court denied the *Marsden* motion, Harrison apparently rolled his eyes and shook his head, and protested that the court thought he was lying, asking, "How could you just not believe me and make me a liar?" The trial court responded, "Because you're sitting there in a little red suit." This comment was an apparent isolated, albeit injudicious, quip made at the conclusion of the hearing and long before a jury was impaneled. In light of the record as a whole, it fails to demonstrate that the trial court had lost its objectivity or ruled erroneously on Harrison's request to substitute Levy. (*Id.* at p. 604.)

In sum, the trial court did not commit reversible error in its pretrial rulings.

19

## B. The Victims' Alleged Prostitution

Harrison next argues that he "was not . . . able to corroborate . . . evidence of prostitution and he was not allowed to confront and cross-examine the victims on whether they were prostitutes." He claims that "[w]hether this denial was the result of California's 'rape-shield' law . . . or defense attorney's incompetence in litigating 'rape shield' issues . . . , defendant was denied his due process right to present a complete defense." This argument presupposes that there *was*, in fact, corroborating and admissible evidence that the victims had engaged in prostitution. But Harrison has wholly failed to show that this was the case.

### 1. Background

#### a. Preliminary Hearing

At the preliminary hearing, Jane Doe No. 2 was asked on cross-examination whether she was working as a prostitute on the day of Harrison's attack, and she answered that she was not. When asked if she was "ever working as a prostitute around that time," she responded, "I have before." She stated that she had not engaged in prostitution before the attack and did not have any type of agreement to exchange sex for money with her attacker, but that after the attack she "got into" prostitution. In response to a question asking her whether she was working as a prostitute on the night of the attack, she again denied it. She also repeated that she had not worked as a prostitute before the attack.

Jane Doe No. 3 likewise testified on cross-examination at the preliminary hearing that she had not been working as a prostitute on the night of the attack, and when asked whether she was working as a prostitute around that time period, she responded, "I've never done that." Jane Doe No. 4 also testified on cross-examination at the hearing that she had never worked as a prostitute, including on the night of the attack. Jane Doe No. 1 did not testify at the preliminary hearing.

#### b. Pretrial Motion

Before trial, Harrison moved to introduce evidence of the victims' prior sexual conduct under Evidence Code section 782. In general, this section requires a defendant

20

to make an offer of proof explaining the relevancy of the evidence of sexual conduct of the complaining witness and calls for a hearing outside the presence of the jury prior to the admission of the evidence. (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782.) Harrison argued that most of the victims in this case were assaulted in a part of Oakland known as "a large prostitution area," that tests on Jane Doe No. 4 revealed "epithelial cells" that did not belong to her or Harrison, that tests on Jane Doe No. 3 revealed DNA from two or three donors, and that Jane Doe No. 2 admitted to prostitution. Harrison failed to provide any further information to support the theory that Jane Does Nos. 1, 3, or 4 were prostitutes.

As for Jane Doe No. 2, the prosecutor stated that this victim had been arrested in Santa Ana a few days after Harrison's attack and cited for loitering with intent to commit prostitution. According to the prosecutor, there was no record of a conviction, and there was no police report regarding the incident. The prosecutor argued that it was premature to consider the admission of evidence of Jane Doe No. 2's arrest because the procedure set forth in Evidence Code section 782 to admit evidence of sexual conduct had not been followed, and there had been no showing that loitering with the intent to commit prostitution was a crime of moral turpitude or relevant on the issue of Jane Doe No. 2's credibility. The trial court apparently agreed, stating, "I think there's a lot of difference between loitering to do something. That's someone else's interpretation of what they were standing there doing. Without the police report we wouldn't know exactly what they were doing."

The court denied the motion without prejudice to provide attorney Levy with the opportunity to research the issue whether loitering was a crime of moral turpitude and thus possibly admissible. At no subsequent time, including during the trial, was a motion made under Evidence Code section 782.

### c. *Trial Testimony*

Even though no motion under Evidence Code section 782 was made at trial, the victims' alleged involvement in prostitution became an issue after the victims had finished testifying.

21

An audio recording of a police interview with Harrison was played for the jury. After this recording was played, an Oakland police officer who participated in the interview testified that Harrison stated during the interview that he did not recognize the victims when he was shown their pictures and said nothing about having had sexual contact with them. The relevance of this evidence was that it undermined Harrison's claim that he had consensual sex with the victims.

Prostitution was first explicitly discussed when the same officer, on cross-examination by Levy, was asked about " 'the stroll,' " an area in Oakland where "there are quite a few prostitutes." The officer testified that Jane Doe No. 1 was attacked at "the eastern most edge of the stroll," and Jane Doe No. 2 was attacked somewhere between two to five blocks away from the stroll. The officer testified that Jane Doe No. 3 was attacked in an area about four to five blocks away from an area known for transgender prostitutes (there was no evidence presented that Jane Doe No. 3 was transgendered), and Jane Doe No. 4 was picked up in an area that was "a fair distance away from the prostitution stroll."

Prostitution was next discussed at trial when Harrison, against the advice of his attorney, testified in his own defense. On direct examination, he testified that "the stroll" was an area where "everybody know[s] where to go to pick up a prostitute." On cross-examination, he testified at length, and, over no objections, about his belief that the victims were prostitutes. He testified that he used to have sex with prostitutes in Oakland on a regular basis and, while he couldn't remember having ever specifically interacted with the victims, "the only way" his DNA could have been found with them was if he had had sex with them as prostitutes. Still, he denied having had "forced sex" with them.

Finally, both sides talked about prostitution in their closing arguments. The prosecutor focused on the DNA evidence linking Harrison to the victims, and stated that even if all the victims admitted to being prostitutes, there would still be a "completely overwhelming" case against Harrison, because there was only one source of DNA common to all the victims. The prosecutor also questioned Harrison's claim that the victims were prostitutes and pointed out the implausibility that someone else happened to

22

sexually assault the victims on the same night that Harrison had had consensual relations with them.  In her closing argument, Levy argued that the victims were prostitutes and had consensual sexual encounters with Harrison, and she hypothesized that "for all we know" whoever attacked the victims used a condom and did not leave DNA evidence.  During his rebuttal argument, the prosecutor again discussed the absence of evidence that the victims were prostitutes, and he emphasized that it was irrelevant even if they were.

### 2.  Evidence Was Not Impermissibly Excluded

Harrison contends that he "was entitled to corroborate his testimony that the victims were prostitutes."  Specifically, he claims that he should have been allowed to cross-examine the victims about prostitution because "[e]ven if the alleged victims denied being prostitutes, their denials would be subject to jury evaluation and rejection."  We are not persuaded.

In pretrial proceedings, Harrison's motion to inquire into the victims' prior sexual activity was denied without prejudice for him to renew the request so long as he complied with Evidence Code section 782.  "Under California's rape shield law, specific instances of a complaining witness's sexual conduct are not admissible to prove consent by the complaining witness in a prosecution for specified sex offenses.  (Evid. Code, § 1103, subd. (c)(1).)  Such evidence may be admissible, though, when offered to attack the *credibility* of the complaining witness, provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in Evidence Code section 782.  First, the defendant must file a written motion and an offer of proof detailing the relevancy of the evidence.  (*Id.*, § 782, subd. (a)(1), (2).)  If the court finds the offer sufficient, it shall order a hearing out of the presence of the jury to allow questioning of the complaining witness.  (*Id.*, § 782, subd. (a)(3).)  If the court finds the evidence relevant under section 780 [credibility generally] and admissible under section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted.  (*Id.*, § 782, subd. (a)(4).)"  (*People v. Fontana* (2010) 49 Cal.4th 351, 354.)  "[T]he credibility exception has been utilized sparingly, most often in cases where the victim's prior sexual history is one of

23

prostitution. [Citations.]" (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708.) We will not disturb a trial court's ruling on the admissibility of prior sexual conduct absent a showing of an abuse of discretion. (*Id.* at p. 711.)

During the trial, Harrison never renewed his request to cross-examine the victims about whether they were prostitutes, much less with an offer of proof under Evidence Code section 782. On appeal, he does not even claim that he *could* have made such an offer regarding Jane Does Nos. 1, 3, and 4. As for Jane Doe No. 2, rather than moving to cross-examine her on her possible involvement in prostitution, Levy simply acknowledged that she was unable to inquire into the area.[2]

Although they were not asked about prostitution, the victims were asked about some sexual activity. Jane Doe No. 1 testified that she had had sex with her boyfriend on the night of the attack, that they had used a condom, and that she had responded untruthfully on the night of the attack when a nurse at the hospital asked her whether she had had sexual intercourse within the previous 72 hours. Jane Doe No. 3 testified that she had a boyfriend at the time of Harrison's attack, that she had had sex with him the previous afternoon using a condom, and that her boyfriend had kissed her on her breasts in the same place where Harrison had. She did not mention this consensual sexual encounter when she was examined after the attack, apparently because no one asked her about other sexual contact. Although the victims were not specifically asked whether they had engaged in prostitution, Levy questioned them about why they were alone after dark despite having been with friends or family earlier in the evening, presumably to raise an inference that they were hiding something.

---

[2] After Jane Doe No. 2 began testifying, the trial court, prosecutor, and defense counsel discussed outside the presence of the jury the anticipated scope of cross-examination. The prosecutor again stressed that there was scant evidence that Jane Doe No. 2 had engaged in prostitution, explaining that the victim had been "arrested for but never charged with loitering with intent to commit prostitution," and that "it was just some alleged conduct." Defense counsel stated that she understood that she was not permitted to pursue the topic on cross-examination.

Far from violating Harrison's constitutional rights or showing ineffective assistance of counsel, Levy's decision not to ask the victims about their involvement in prostitution appears to have been reasonable and sensible. As mentioned above, Harrison does not now point to any evidence that Jane Does Nos. 1, 3, and 4 were in fact prostitutes (other than his own claims at trial), and he does not seriously contend that he could have met the "strict" statutory requirements of Evidence Code section 782. (*People v. Rioz* (1984) 161 Cal.App.3d 905, 917, fn. 5.)

And any such motion regarding Jane Doe No. 2 would almost certainly have been denied. Jane Doe No. 2 was *arrested* for—but so far as we know not actually *charged* with—loitering hundreds of miles away from the scene of Harrison's attack days *after* it occurred. The introduction of such an arrest would have had little probative value on her credibility. Mere arrests are usually inadmissible for impeachment purposes (*People v. Medina* (1995) 11 Cal.4th 694, 769), as is evidence of conduct not involving moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 313-316; *People v. Lepolo* (1997) 55 Cal.App.4th 85, 89-90.) Although evidence that a victim participated in "a form of prostitution is conduct involving moral turpitude which is admissible for impeachment purposes" (*People v. Chandler*, *supra*, 56 Cal.App.4th at pp. 708-709), courts have found no error for a court to exclude evidence of a sexual encounter that occurred in "vaguely parallel circumstances." (*People v. Steele* (1989) 210 Cal.App.3d 67, 76.) One of the primary purposes of Evidence Code section 1103, subdivision (a)(1), which bars the introduction of rape victims' prior sexual activity absent a sufficient showing under section 782, is to prevent "the victim of sexual assault from being herself placed on trial." (*People v. Rioz*, *supra*, 161 Cal.App.3d at p. 916.)

Moreover, any possible error excluding the evidence of Jane Doe No. 2's arrest was clearly harmless because it is not reasonably probable that it affected the verdict. (*People v. Chandler*, *supra*, 56 Cal.App.4th at p. 711.) Two employees who were in the tea plant where Harrison drove Jane Doe No. 2 on the night of the attack corroborated her version of events by testifying about her screams and about their actions to help her. The physician's assistant who prepared the sexual assault exam report on Jane Doe No. 2

testified that the victim's injuries were consistent with her version of events, and Harrison's DNA was found on a swab taken from Jane Doe No. 2 shortly after the attack.

We find no error in light of our review of the entire record. Harrison failed to renew his request to cross-examine Jane Doe No. 2 or the other victims about their potential involvement in prostitution. Any such request would likely have been denied and—even if granted—would not likely have advanced Harrison's defense. For the same reasons, we reject Harrison's related argument that Levy was ineffective in failing to cross-examine the victims about their involvement in prostitution. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*) [to demonstrate ineffective assistance of counsel, defendant must show both that performance was deficient and that performance prejudiced him].) Even if she thought that a request to cross-examine Jane Doe No. 2 or the other victims would have been permitted, Levy could have reasonably believed that asking them about prostitution would not have advanced Harrison's defense because the victims would have denied it, as Jane Does Nos. 3 and 4 had done at the preliminary hearing, and their denials would have made it even more difficult for Levy to suggest in closing argument, as she did, that the victims were prostitutes.

3. There Was No Prosecutorial Misconduct

Harrison contends that the prosecutor engaged in misconduct because he commented in closing argument about the lack of cross-examination and evidence about the victims' involvement in prostitution. We disagree.

*a. Cross-examination*

As mentioned above, Harrison testified at length on cross-examination about his belief that the victims were prostitutes. At one point, in response to Harrison's testimony about his interview with police during their investigation, the following exchange took place:

"Q.    You keep saying this thing over and over. I don't understand it. The police didn't tell you they were prostitutes—

"A.    They didn't.

26

"Q. I would suggest to you that's because none of them were prostitutes. I mean, where is your evidence that they're prostitutes?

"A. Well, we can't bring it up.

"Q. Oh okay. You're saying you can't bring it up.

"A. Can we bring it up? Because I have—

"THE COURT: I don't know what you're talking about. Just answer his question.

"[Defendant]: Like I said, I know the area where they said they was walking at, and I seen some of the background on the females.

"[Prosecutor]: Q. What evidence do you have that Jane Doe No. 3 here is a prostitute?

"A. I didn't get—I didn't get all of the reports. I just got half of the reports, and I seen which ones that I seen. But I do know the area where she said she was walking down.

"Q. I didn't hear anybody in this courtroom ask them if they were prostitutes. Did you hear that?

"A. No, I didn't. That's because ya'll said it was rude. You said we couldn't bring it up.

"Q. You can always ask, can't you, Mr. Harrison?

"[Defense counsel]: Your Honor, I'm going to object. That's legally beyond Mr. Harrison's knowledge and also—

"[Prosecutor]: That's fine."

### b. Rebuttal Argument

In response to Levy's claims during closing argument that the victims were prostitutes who had consensual sexual relations with Harrison, the prosecutor pointed out that Levy had never asked any of the victims when they testified whether they were prostitutes. Without objection, he argued as follows: "Let's say they were prostitutes and they said no, well, then you can always impeach them with their prior prostitute convictions. But see, Ms. Levy, didn't go through that exercise. The defendant kept

27

trying to say it. It's interesting that nobody asked the women or confronted them with it. [¶] I took all Mr. Harrison's lies and stories and threw them right in his face and asked him to explain it. Defense didn't bother to do that."

The prosecutor also argued, again without objection: "And I even said it to Mr. Harrison when he was on the stand. I said, Mr. Harrison, if there's evidence somebody's a prostitute, this is the courtroom. This is where you bring that evidence. What comes in through the testimony of witnesses is evidence. What doesn't come in is not evidence so you can't consider or speculate about it. [¶] This whole notion that these women are out there as prostitutes is something wholly unsupported by any evidence except some vague allegations that a woman who was out [late at night] after which any woman on the streets of Oakland is a prostitute. . . . [¶] So this is all sort of part of a vague smeary campaign meant to make you think vaguely about something without really evaluating is there factual support with that. Could the defense have asked the question why didn't they, what should we conclude from the fact that they didn't, and that there's no evidence."

### c. Analysis

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

At the outset, we agree with respondent that Harrison waived his claims of prosecutorial misconduct by failing to object below. (*People v. Hill*, *supra*, 17 Cal.4th at p. 820 [defendant may not complain on appeal of prosecutorial misconduct unless defendant objected below in timely fashion and on same ground and requested that jury be admonished to disregard impropriety].)

28

But even if Harrison had preserved the issue of prosecutorial misconduct, we would conclude that it lacks merit. The only evidence of possible prostitution that was excluded was the single loitering incident involving Jane Doe No. 2. The fact that this victim was *arrested* hundreds of miles from the scene of the attack on her for loitering (a crime that may include such activities as "engag[ing] in conversations with passersby," § 653.22, subd. (b)(1)) falls far short of establishing that she worked as a prostitute in Oakland on the night of Harrison's attack or at any other time. This case is therefore easily distinguished from *People v. Varona* (1983) 143 Cal.App.3d 566, upon which Harrison relies, where the prosecutor improperly argued there was no evidence the victim was a prostitute in a case where the defendant had produced evidence that she in fact previously had pleaded guilty to prostitution (apparently in the same area where the crime in *Varona* took place), and that she specialized in providing oral copulation, a crime of which the defendant there was accused. (*Id.* at pp. 568-570.)

Here, there was nothing improper about the prosecutor challenging the suggestion initiated by Harrison at trial that the victims were prostitutes. Once Harrison claimed they were prostitutes, it was well within the prosecutor's discretion to point out that Harrison had little, if any, evidence to support the claims. (*People v. Wharton* (1991) 53 Cal.3d 522, 567 [prosecutor given wide latitude during argument so long as it amounts to fair comment on evidence, including reasonable inferences and deductions to be drawn therefrom].) We therefore also reject Harrison's argument that Levy's failure to object to the topic during cross-examination amounted to ineffective assistance of counsel. (*People v. Carter* (2003) 30 Cal.4th 1166, 1210 [counsel not ineffective in failing to object on grounds that lack merit].) Again, it was Harrison himself who testified that the victims were prostitutes. In a sign that she was doing her best to manage the situation, Levy did lodge a successful objection to the prosecutor's question about why the victims were not asked whether they were prostitutes. We find no prosecutorial misconduct warranting reversal of Harrison's convictions.

*C. No Ineffective Assistance of Counsel*

Harrison raises a series of other claims of ineffective assistance of counsel, arguing that his convictions should be reversed because his attorney "provided ineffective assistance of counsel at every stage of [his] case." In order to show ineffective assistance of counsel, Harrison must show both that counsel's performance was deficient and that the performance prejudiced him. (*Strickland*, *supra*, 466 U.S. at p. 687.) "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Citation.] A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Citation.] The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' [Citation.]" (*Harrington v. Richter* (2011) __ U.S. __, 131 S.Ct. 770, 787.) "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Citation.] Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.]" (*Id.* at pp. 787-788.)

Harrison falls short of meeting this standard because none of the alleged errors he identifies demonstrates that his counsel's performance fell below an objective standard of reasonableness or undermines our confidence in the outcome of the trial.

*Defense Counsel's Ability to Hear*: Harrison points to the fact that Levy had difficulty hearing testimony. A review of the record reveals that the victims testified about traumatic events and were understandably soft spoken and that the trial court explained several times that it was important to speak directly into the microphone. The fact that Levy asked them to speak up in order to hear their testimonies, most likely so

that she could effectively cross-examine them, demonstrated that she was listening and engaged.

*Witness's Reference to Harrison's Incarceration*:  In response to Levy's question on cross-examination whether Harrison resembled the "stocky, buff" man who attacked her, Jane Doe No. 2 responded, "He's slim today but he had been incarcerated so things have changed."  When counsel asked the witness to speak "slowly and a bit louder," the trial court told her, "You don't want her to repeat that, Ms. Levy, I don't think," then held an unreported bench conference.  Harrison's appellate counsel faults Levy for not requesting an admonishment or curative instruction regarding Jane Doe No. 2's reference to Harrison's incarceration.  But the record shows that Jane Doe No. 2 had testified quietly, and Levy could easily have concluded that the jurors had not fully understood what the witness said and wanted to avoid calling more attention to the witness's reference to Harrison's incarceration.

In any event, Harrison can show no prejudice for Levy's failure to request an admonition.  Because Jane Doe No. 2 testified about an attack that took place more than four-and-a-half years before trial, it is not surprising that Harrison's appearance might have changed.  A quiet and passing reference to the fact that Harrison was incarcerated during that time does not undermine our confidence in the verdict.  (*Harrington v. Richter*, *supra*, 131 S.Ct. at pp. 787-788.)

*Prosecutor's Reference to Other Victims*:  The prosecutor questioned Harrison, without objection, about the fact that originally he had been investigated for sexual assaults on a total of six women, two of whom were not considered by the jury (one because she did not testify at the preliminary hearing and the other because she could not be located for trial), and also referred to the fact that Harrison had at one point represented himself.  Harrison does not specifically contend that it was error for the prosecutor to question him in this manner, or set forth the grounds upon which defense counsel supposedly should have objected, and instead speculates on what the jury might have concluded based on this line of questioning.  (*Michael P. v. Superior Court* (2001) 92 Cal.App.4th 1036, 1042 [court need not address argument for which party provides no

31

supporting authority].)  Thus, we reject his argument because Harrison does not articulate how his counsel's performance fell below an objective standard of reasonableness. (*People v. Jones* (1998) 17 Cal.4th 279, 304 [where claim presented perfunctorily and without supporting argument, court may reject it in similar fashion].)  For the same reason, we also reject Harrison's complaint that he was cross-examined, without objection, about whether having unprotected sex with prostitutes was comparable to "Russian roulette."

*Harrison's Decision to Testify*:  Levy did not directly question Harrison on direct examination about his claim that the victims were prostitutes, a topic addressed at length on cross-examination. During a recess after cross-examination had begun, Levy told the trial court outside the presence of the jury that she had "advised Mr. Harrison not to testify.  I practically begged him.  I just need to put that on the record."

On appeal, Harrison faults Levy for avoiding on direct examination the issue of the victims being prostitutes, arguing that counsel's "presentation of defendant's testimony to the jury could only convey that she did not believe defendant's testimony and knew he was lying."  Harrison fails to identify, however, how counsel could have better proceeded once it became clear that Harrison insisted that he testify.  As discussed above (§ II.B.2.), Levy likely had no basis under Evidence Code section 782 to inquire into this area or to believe that it would advance Harrison's defense.

*Closing Argument*:  Harrison characterizes counsel's closing argument as "incompetent," because she acknowledged that the victims described similar attacks and failed to summarize Harrison's "actual defense presented to the jury" that he was not present when the crimes were committed.  A fair reading of defense counsel's closing argument reveals that she did her best to highlight the only conceivable holes in the prosecutor's case, stressing that the victims' testimonies were at some points unbelievable and contradictory, questioning their credibility, and suggesting that they had had consensual sexual encounters with Harrison.  We agree with respondent that Levy presented the best argument she could given the state of the evidence, and we are not persuaded by Harrison's arguments to the contrary.

In sum, Harrison falls short of demonstrating that his trial counsel was ineffective.

*D. No Cumulative Prejudice*

Finally, we reject Harrison's argument that the cumulative effect of the alleged errors identified above compels reversal.  (*People v. Kipp* (1998) 18 Cal.4th 349, 383 [issues raised on appeal did not singly or cumulatively establish prejudice requiring reversal of convictions].)

III.
DISPOSITION

The judgment is affirmed.


_____
Humes, J.


We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.


*People v. Harrison* (A132915)

Trial Court:                          Alameda County Superior Court

Trial Judge:                          Honorable Joan S. Cartwright

Counsel for Appellant:                Waldemar D. Halka, under appointment by the First District Appellate Project

Counsel for Respondent:               Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Allan Yannow, Deputy Attorney General